**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BYRON CHRISTMAS, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.  08 C 4675 |
| v. | ) | |
| | ) | Judge Manning |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## **PLAINTIFFS' RULE 59 MOTION FOR A NEW TRIAL**

Now come Plaintiffs Tiffany Banks, Byron Christmas, and Naomi Christmas, by their

attorneys, moving this Honorable Court for a new trial pursuant to Federal Rule of Civil

Procedure 59.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………… iii-iv

INTRODUCTION ……………………………………………………………….. 1

SUMMARY OF PLAINTIFFS' ARGUMENT ………………………………… 2

BACKGROUND ……………………………………………………………… 4

      The 911 Calls and Radio Dispatches …………………………………………... 5

ARGUMENT ………………………………………………………………... 7

   I.     The Legal Standard ………………………………………………… 7

   II.    The Actions of Defendants and Their Counsel at Trial …………………..……... 9

        A. Opening Statement ………………………………………………… 9

        B. Counsel's Improper and Unsubstantiated Remarks Regarding
           Mr. Christmas ………………………………………………….……… 11

        C. Officer Loaiza's Testimony Regarding Barred Evidence ……….……… 13

        D. OEMC Witness Laura Dunaj ………………………………….…...…. 14

        E. Officer Rendon's Testimony Regarding Inadmissible
           Communications …………………………………………….……… 17

        F. Other Prejudicial Misconduct ……………………………………… 19

   III.   Defendants' Actions Prevented Plaintiffs from Receiving
        a Fair Trial ……………………………………………………….……… 22

        A. The Cumulative Impact of Defendants' Actions was
           Overwhelming ………………………………………………….…..... 22

        B. When Counsel Asserted that Plaintiffs' Counsel Did Not Believe Their
           Own Clients' Testimony, Counsel Committed Reversible Error …...….……. 25

        C. Counsel's Other Prejudicial Statements During Closing Rendered the
           Trial Unfair to Plaintiffs ……………………………………………… 27

CONCLUSION …………………………………………………………... 28

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Agushi v. Duerr*, 196 F.3d 754 (7th Cir. 1999) …………………………………………………... 7

*Cotter v. McKinney*, 309 F.2d 447 (7th Cir. 1962) ………………………………………….. 9

*Garperini v. Center for Humanities, Inc.*, 518 U.S. 415, (1996) …………………………. 9, 22

*Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, (7th Cir. 2000) …………….. 7

*Hillard v. Hargraves*, 197 F.R.D. 358 (N.D. Ill. Feb. 4, 2000) ………………. 7, 8, 23, 24, 25

*Jonasson v. Lutheran Child and Family Services*, 115 F.3d 436, (7th Cir. 1997) ……………. 6

*Juneau Square Corp. v. First Wisc. Nat'l Bank*, 624 F.2d 798 (7th Cir. 1980) …………… 9, 22

*Kapelanski v. Johnson,* 390 F.3d 525 (7th Cir. 2004) ………………………………………… 7

*Kiefel v. Las Vegas Hacienda* 404 F.2d 1163 (7th Cir. 1969) ………………………… 7,24

*Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53 (7th Cir. 1959) …………………………...… 8

*Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir. 1985) …………………………. 7, 8, 22, 23, 24, 25

*Mayall v. Peabody Coal Co.* 7 F.3d 570 (7th Cir. 1993) ……………………………………… 8

*Mileski v. Long Island R. Co.*, 499 F.2d 1169 (2d Cir. 1974) …………………………… 8

*Ross v. City of Evanston,* No. 96 C 6042, 1998 WL 177738 …………………………… 6

*Schick v. Illinois Dept. of Human Servs.*, 307 F.3d 605 (7th Cir. 2002) ……………...……7

*Soltys v. Costello*, 520 F.3d 737 (7th Cir. 2008) …………………………………………... 8

*Spicer v. Rossetti,* 150 F.3d 642 (7th Cir. 1998) …………………………………… 25, 26

*United States v. Van Eyl,* 468 F.3d 428 (7th Cir. 2006) …………………………… 8, 27

*United States v. Williams,* 81 F.3d 1434 (7th Cir. 1996) ……………………………… 7, 8

**<u>Statutes and Other Authority</u>**

Fed. R. Civ. Pro. 59 …………………………………………………………………….. 7

42 U.S.C. § 1983 ……………………………………………………….…… 22, 23, 25

Wright & Miller, Federal Practice and Procedure: §2803 (1973 & Supp. 1979) ……………… 9

*The Motion in Limine: Trial Without Jury--A Government's Weapon Against the Sanctuary Movement*, 15 HOFSTRA L. REV. 5 (1986). ………………………………………..… 6

iv

**INTRODUCTION**

Throughout the trial in this case Defendants repeatedly and intentionally violated this Court's orders and rulings. Defendants interjected barred evidence about 911 calls and dispatches to give the jury the unmistakable but false impression about Plaintiffs and the events in this case. Doing so allowed Defendants to camouflage false evidence as the truth and to present a one-sided story. Defendants' closing argument contained numerous prejudicial statements, which served to drive their improper narrative home. The cumulative result of Defendants' actions was that Plaintiffs were denied a fair trial.

## SUMMARY OF PLAINTIFFS' ARGUMENT

By violating this Court's orders, Defendants were able to present inadmissible assertions to the jury that: (1) the officers had received dispatches containing a description of a 400 pound man selling drugs out of a gold Intrepid in the days prior to August 27, 2007; (2) the officers got "the right guy" after Mr. Christmas' arrest; (3) there was actual proof of a call on August 27, 2007 about a 400 pound man selling drugs out of a gold Intrepid (when there was not); (4) Mr. Christmas had threatened witnesses (he did not); and (5) even Plaintiffs' counsel did not believe the Plaintiffs (improper and untrue). In effect, Defendants were able to improperly present a one-sided story that Byron Christmas had been selling narcotics out of a gold Dodge Intrepid for many days, and that Defendants arrested the right person.

Defendants achieved this goal through the following impermissible means: (1) shouting during sidebars; (2) testifying directly about matters which had been barred;[1] (3) presenting a witness related to the 911 calls exclusively to elicit barred testimony; (4) making inappropriate closing arguments; and (5) inserting counsel themselves into the case as an aggrieved party. The result of the above conduct could only have been that the jury was improperly led to believe that Byron Christmas was in fact a drug dealer and that Plaintiffs were responsible for hiding central "truths" from the jury. This impermissibly cast a pall on Plaintiffs' credibility in a case where credibility was a deciding factor.

The situation that Defendants created at trial, through their steady flow of inadmissible testimony and counsel's comments, was far worse for Plaintiffs than if they had simply lost their motions *in limine* outright. The Court's rulings on those motions and the evidentiary rulings at

---

[1] Defendant Officers testify in court regularly as part of their job. They are professional witnesses who are familiar with the workings of a court of law and the importance of judicial rulings.

trial were proper. But Defendants introduced the barred evidence anyway, doing so in a manner that disallowed Plaintiffs from effectively rebutting Defendants' insinuations and that could not be cured. If the 911 tapes had been admitted and the 911 witness would have testified, Plaintiffs could have shown that multiple strip searches took place in the alley. Plaintiffs would have been able to rebut demonstrably false testimony about prior 911 calls without the worry that it would open the door to other barred evidence.

Instead of being free to deal with this evidence and testimony, Plaintiffs had to focus on mitigating and trying to halt the steady stream of Defendants' evidentiary violations. By the time all was said and done, Plaintiffs found themselves sinking into a pond created by the accumulation of Defendants' misconduct. At that point, there was nothing that could be done to address the improper bits and pieces that comprised the morass. The damage was done. The way Defendants consistently put barred evidence and improper assertions before the jury cumulatively amounted to a trial that was unjust to Plaintiffs. The result was not a product of the jury balancing the admissible evidence.

3

## BACKGROUND

On August 27, 2007, Bryon Christmas and Tiffany Banks stopped in the alley behind the

3400 block of West Douglas so that Tiffany could use the bathroom at the apartment of an

acquaintance. Ex. A at 251:5-11, 253-254:5. Tiffany took her four week old baby Naomi with

her, and began walking towards the apartment door. *Id.* at 254:8-11. While Tiffany took Naomi

and went to use the bathroom, Byron Christmas waited in the alley in Ms. Banks' gold Dodge

Intrepid. *Id.* at 681:14-19, 276-277:21-2. A childhood friend from the neighborhood, Roy

McDavis, approached the car and began conversing with Mr. Christmas. *Id.* at 681-82:20-9.

Shortly thereafter, Byron and Roy were confronted by Defendant Officers Loaiza and Rendon.

*Id.* at 684-85.

Officer Loaiza demanded that Byron get out of the car. *Id.* After Byron complied, the rest

of the Defendants arrived. *Id.* at 686-87. Officer Loaiza took Byron to a nearby gangway and

told Byron to strip naked. *Id.* at 688-89. When Byron resisted this demand, the other Defendant

Officers rushed to the gangway. *Id.* at 690. Watching this from across the courtyard, Tiffany

shouted for Byron to do what the Defendant Officers asked. *Id.* Bryon took off all of his clothes,

in public view. *Id.* After he was naked, Officer Loaiza told Byron to lift his stomach and Officer

Loaiza inspected Byron's genital area. *Id.* at 690-91. Then Officer Loaiza demanded that Byron

turn around and face the wall. *Id.* at 691. Officer Loazia then got on his knees and inserted

gloved fingers into Byron's rectum. *Id.* at 692. While this occurred, other Defendant Officers

joked about Mr. Christmas' humiliation. *Id.*

Defendant Officers Kubik and Bocanegra called Tiffany down from the stairway where

she was standing. *Id.* at 265:19-22, 266:2-3. Tiffany took Naomi with her as Defendant Officers

4

escorted her to a gangway further down the alley. *Id.* at 266:7, 267:13-16. Officer Medina watched and made sexually charged remarks as Ms. Banks was stripped and searched. *Id.* at 270:3-14, 273:9-24. Officer Kubik ripped off the bandage covering an infection to the site of Tiffany Banks' recent Caesarean section wound. *Id.* at 274-275:23-8. After they were finished, Defendant Officers arrested Byron Christmas and Tiffany Banks, and despite their obvious innocence had them charged with felony narcotics charges. *Id.* at 280-81:25-9, 511:7-19. Defendant Officers left the infant Naomi behind at the scene of the arrests at a gangway near the alley. *Id.* at 288:1-6, 397:8-18, 700:2-3. Both Byron Christmas and Tiffany Banks were found not guilty at their criminal trials. *Id.* at 513:3-4, 289:5-6, 383:17-21.

### The 911 calls and Radio Dispatches

The 911 calls and radio dispatches were involved in many of Defendants' evidentiary abuses. For that reason, Plaintiffs summarize them here.[2]

On August 26, 2007, the day before Plaintiffs' arrests, Office of Emergency Management and Control (OEMC) records indicate two 911 calls. At 1:23 p.m., the call includes "man selling drugs in the alley, male black, 400 lbs, dark complexion, customers lined up in the alley." *See* Exhibit B. At 2:19 p.m. The second call indicates "several drug dealers in the alley selling drugs." *See* Exhibit C.

On August 27, 2007, Defendant Loaiza claims that he received an assignment based on a 911 call which stated that there was a 500 pound male black selling drugs out of a gold Dodge Intrepid. There is no record of any 911 call, dispatch communication, or PDT matching Defendant Loaiza's description of the claimed assignment.

---

[2] It is important to distinguish between 911 calls and radio dispatches. 911 calls were not heard by the officers until this litigation. Radio dispatches can be heard by officers over their radios.

On August 27, 2007, there are recordings of a 911 call at 1:06 p.m., in which the caller

states "Hello is this the police department? Yesterday I called because they were selling the

drugs in the back. The police back there now. I wish I could go back there and tell them that they

got the right ones but I don't want these folks to kill me. The police got them in the back of 3426

and they got the right one, they got the big timer and the worker. That's the one that puts the

stuff out there." *See* Exhibit D.[3] This call is reflected in a dispatch made shortly thereafter, where

the dispatcher states "CPD on scene in the rear – per caller they have the right guy – he is the

main drug dealer."  *See* Exhibit E.

Because of the highly inflammatory nature of the disputed testimony and exhibits related

to these communications, Plaintiffs sought to resolve admissibility disputes outside of the

presence of the jury. These disputes were the subjects of motions *in limine* and sidebars,

precisely so they would not be put before the jury if not admissible. The prejudicial and

inflammatory nature of these communications was so great that if heard by the jury the damage

could not be undone, even with proper instruction. Motions *in limine* perform "a gate keeping

function and permits the trial judge to eliminate from further consideration evidentiary

submissions that clearly ought not be presented to the jury because they clearly would be

inadmissible…" *Jonasson v. Lutheran Child and Family Services*, 115 F.3d 436, 440 (7th Cir.

1997). "The purpose of a motion in limine is to reduce the likelihood that a jury will be

irrevocably prejudiced against either party to the litigation by hearing inadmissible, irrelevant, or

inflammatory evidence." *Ross v. City of Evanston,* No. 96 C 6042, 1998 WL 177738, at *2 n.3

(N.D. Ill. April 13, 1998), quoting Douglas L. Colbert, *The Motion in Limine: Trial Without*

---

[3] The audio file for the actual 911 call is attached as the exhibit because there is no official transcription or summary
of this call. This file is WAV_59D, produced by Defendants during discovery.

*Jury--A Government's Weapon Against the Sanctuary Movement*, 15 HOFSTRA L. REV. 5 (1986).

## ARGUMENT

### I.    The Legal Standard

Pursuant to Federal Rule of Civil Procedure 59(a), a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Those reasons include where a verdict is against the weight of the evidence, the damages are excessive, or for other reasons which made the trial not fair to the moving party. *Kapelanski v. Johnson,* 390 F.3d 525, 530 (7th Cir. 2004).

Comments by counsel and efforts to put barred evidence before the jury may result in a need for a new trial where these evidentiary errors had "a substantial influence over the jury" and the result was "inconsistent with substantial justice." *Schick v. Illinois Dept. of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002), (citing *Agushi v. Duerr*, 196 F.3d 754, 759 (7th Cir. 1999)). This standard is met where there is a "significant chance" that "evidentiary errors … affected the outcome of the trial." *Schick*, 307 F.3d at 611 (quoting *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000)).

The cumulative impact of trial errors is an additional reason for which a new trial may be granted. *See United States v. Williams,* 81 F.3d 1434, 1443-44 (7th Cir. 1996) (total impact of all irregularities at trial, not each one in isolation, determines whether a defendant is entitled to a new trial); *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir. 1985); *Kiefel v. Las Vegas Hacienda* 404 F.2d 1163 (7th Cir. 1969) (upholding district court grant of a new trial based on cumulative errors and awarding sanctions against party who vexatiously multiplied the proceedings); *Hillard*

*v. Hargraves*, 197 F.R.D. 358, 361 (N.D. Ill. Feb. 4, 2000).  The Court in *Llaguno* explained  in

terms that are especially relevant here:

> We need not decide whether any one of these errors would warrant reversal in and
>
> of itself, or even whether all together would warrant reversal in a different kind of
>
> case. But bearing in mind that civil rights actions often pit unsympathetic
>
> plaintiffs -- criminals, or members of the criminal class (even -- in this case -- a
>
> multiple murderer's parents and brother) -- against the guardians of the
>
> community's safety, yet serve an essential deterrent function especially at a time
>
> like this when the exclusionary rule is being narrowed we take a serious view of
>
> trial errors that consistently favor the defendants in such a case.

*Llaguno*, 763 F.2d at 1570.

A new trial may also be appropriate where improper statements and argument by counsel

caused substantial prejudice to the moving party. *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir.

2008). *See also Mayall v. Peabody Coal Co.* 7 F.3d 570, 573 (7th Cir. 1993) (improper argument

warrants a new trial where they have "influenced the jury in such a way that substantial prejudice

resulted to the opposing party") (citations omitted); *Mileski v. Long Island R. Co*., 499 F.2d

1169, 1171 (2d Cir. 1974) (improper or intemperate argument by counsel in summation may

necessitate a new trial where it tends to arouse undue passion or prejudice on the part of the jury,

thereby depriving the opposite party of a fair trial);  *Klotz v. Sears, Roebuck & Co*., 267 F.2d 53

(7th Cir. 1959) (reversing district court ruling and granting a new trial where counsel's

prejudicial remarks were objected to, the objections sustained, and the jury told to disregard

them). The court may consider the cumulative impact of improper questioning and argument

during the course of the trial to determine whether there was prejudice. *Hillard,* 197 F.R.D.  at

361 (citing *United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996)). *See also United States v.*

*Van Eyl,* 468 F.3d 428, 436-38 (7th Cir. 2006) (upholding granting of new trial where prosecutor

8

made an improper and persuasive argument which could have affected the verdict); *Cotter v. McKinney*, 309 F.2d 447, 552 (7th Cir. 1962) (upholding granting of new trial where attorney improperly argued inadmissible evidence—suggesting insurance coverage—at closing).

Where the trial result was affected by an improper argument or question, or an evidentiary error, the court should use its authority to protect the right to a jury trial by granting a new trial. "The exercise of a trial court's power to set aside the jury's verdict and grant a new trial is not in derogation of the right of trial by jury but is one of the historic safeguards of that right." *Garperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (internal quotation omitted). *See also Juneau Square Corp. v. First Wisc. Nat'l Bank*, 624 F.2d 798, 806 n.11 (7th Cir. 1980) ("it is the [trial judge's] right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so") (quoting Wright & Miller, Federal Practice and Procedure: §2803 (1973 & Supp. 1979)).

## II.    The Actions of Defendants and Their Counsel at Trial

### A.  Opening Statement

During his opening statement, counsel for the officers repeatedly referred to the details of 911 calls despite this Court's rulings and despite a string of sustained objections. Plaintiffs addressed the Court prior to the opening statements to make sure that this inflammatory and ultimately inadmissible evidence would not be rammed through the door. The Court agreed with Plaintiffs that, at a minimum, the context of the party's testimony would be needed to evaluate the admissibility of the evidence. *See* Exhibit F, *Christmas v. City of Chicago*, Judge Manning, Case No. 08-C-4675, Doc. No 92 (reserving judgment on the details of the 911 calls until it could be established what the Defendants actually heard or knew of them.) Counsel for the

9

Defendants was aware of this too, stating to the Court, "As the motion *in limine* ruling anticipated, as long as we lay a foundation for it, Your Honor would reserve ruling." Exhibit A at 8:15-17. And immediately before Defendants' opening statement, this Court reiterated that Plaintiffs did not open the door to the 911 calls in their opening statement. *Id.* at 220:3.

During his opening statement, counsel for the defense said the following:

> MR. NATHAN:
>> On August 25th, 2007, a Saturday, a concerned citizen had the courage to call 911 and report a drug deal was going on.
>
> MR. C. SMITH: Judge, objection.
>
> THE COURT: I'll sustain the objection.
>
> MR. NATHAN:
>> These officers were directed based on the 911 call center to go to the alley of Douglas Boulevard, the north alley.
>
> MR. C. SMITH: Objection.
>
> THE COURT: Counsel, I have sustained the objection to any reference to that.

Ex. A at 221:7-14.

At that juncture, Plaintiffs asked for a sidebar and were denied. Counsel for defendants persisted in blatant disregard of now multiple rulings. The Court then called for a sidebar and told counsel, "You're trying to go in the back door. I told you that information is not going to be divulged here, counsel." Exhibit A at 222:4-6.

Defendants did not wait until their officers testified in order to lay the foundation for any of these statements. As early as opening statements, Defendants managed to set before the jury that (1) there were 911 calls supporting the officers and (2) Plaintiffs did not want them to hear about these calls. This created the distinct impression that Plaintiffs were hiding information about 911 calls regarding Byron Christmas. As it turns out, not one of the Defendants actually

10

heard any of the calls on August 26, 2007, nor could they have. Defendants knew this at the time of their opening statement, but chose to present evidence of the 911 calls before that could be established. Plaintiffs moved for a mistrial. Exhibit A at 222:13-15. That motion was not granted.

**B. Counsel's Improper and Unsubstantiated Remarks Regarding Mr. Christmas**

In a sidebar during openings, speaking in an unnecessarily loud voice, counsel for the defense, shouted out that: (1) an anonymous 911 caller is "scared to death" of Mr. Christmas; (2) Mr. Christmas is a "major drug dealer"; (3) Mr. Christmas broke the witness' car windows in retaliation; (4) "thank the Lord that she is not in this courtroom," and; (5) this "is a fraud on this Court, Judge, and a fraud to this jury." Exhibit A at 219-220:14-2. None of these accusations was ever substantiated. None of these items were ever raised prior to counsel's loud announcement during trial. Plaintiffs renewed their motion for a mistrial, this motion was denied. *Id.* at 235-240. Counsel for the Defense conceded that she had been speaking in a loud voice during the sidebar. *Id.* at 238-39:25-3.

Defense counsel had contact with this witness during the discovery period in this case for months before the trial. If Defense Counsel really had information that Byron Christmas was allegedly threatening a material witness in this case, why not raise this issue prior to trial so that it could be addressed? Indeed, it is difficult to imagine that any attorney would allow the opposing party to threaten an important witness and do nothing about it. This type of allegation is incredibly serious and is of a nature where it should be raised immediately. The venues where it is appropriate or even mandatory to raise such an alleged tampering with witnesses are myriad: during discovery, at the pretrial conference, before *voir dire*, through a written motion, etc. Certainly defense counsel should have raised the issue with Plaintiffs' counsel—if not the

11

Court—to make sure that any threats to witnesses would be immediately stopped. Counsel instead chose the most inappropriate time, manner, and place possible to deliver this unsubstantiated and undisclosed broadside.

Plaintiffs were seated just a few feet away from the jury and heard these comments as clear as day. The damage of counsel's statement could never be undone. During her tirade, counsel claimed that she was speaking "now that there are no parties here." Exhibit A at 219:17. Given her chosen volume level, this was not true. As officers of the Court, defense counsel had a duty to put a stop to any purported threats to witnesses as soon as they learned of it. Defendants should have disclosed whatever statement they received when they received it. It was wholly inappropriate to bring that statement up for the first time at trial, shouted out for the jury to hear.

It should be noted that repeatedly throughout discovery in this litigation Plaintiffs sought the identity of the 911 caller so that she could sit for deposition. Defendants refused to turn over the identity of the 911 caller on the grounds on anonymity. But according to counsel's own statements at trial, Mr. Christmas already knew who she was. Judge Mason did rule that Defendants could withhold the witness' name, while the Defendants kept the Plaintiffs apprised of their efforts to contact this individual and attempt to obtain a waiver. *See* Exhibit G, *Christmas v. City of Chicago*, Judge Mason, Case No. 08-C-4675, Doc. No 30. That did not happen. At no point did Defendants ever tell Plaintiffs that they had been speaking with this witness, much less that she been threatened by Byron Christmas. To be sure, Judge Mason never ruled that Defendants could keep a witness that would have been valuable to the Plaintiffs away from the jury, while presenting related one-sided evidence that could have been addressed through her testimony.

12

### C.  Officer Loaiza's Testimony Regarding Barred Evidence

At trial, Officer Loaiza testified that on August 27, 2007 he received an assignment regarding a 500 pound man selling drugs in the alley behind 3400 West Douglas Blvd. out of a gold Dodge Intrepid. This did not violate the Courts rulings. However, Officer Loaiza also testified that he received calls containing the *same description* from the days prior. Exhibit A at 1011:19-21. This did violate the Court's rulings.

Prior to testifying, the Court had specifically limited Officer Loaiza's testimony in the following ways. Officer Loazia was allowed to testify about the description of the drug dealer that he claimed to have received via PDT on August 27, 2007. Exhibit A at 1002-003:22-03. And the only information regarding the August 26, 2007 calls that Officer Loaiza, or any other witness, was allowed to testify to, was that drug calls were received without going into the details. Trial, Exhibit A at 1003:3-7. It was clear that Officer Loaiza was not allowed to testify about the details of the August 26, 2007 911 calls or dispatches. *Id.* Officer Loaiza, who is a professional witness, was present when the Court made these rulings. Further, this was not a hastily considered matter. The order of the trial was reshuffled so that this Court could make a final determination as to what Officer Loaiza would be able to say about these communications. Exhibit A at 991:10-13.

Nevertheless, during his direct examination, Officer Loaiza testified that,

OFFICER LOAIZA:

My partner and I received what's called an assignment that narcotics -- or drug sales were occurring on the 3400 block of West Douglas in the alley by a 500-pound male black who was inside a gold-colored vehicle parked there in the alley.

MR. GREEN

13

> Q. Now, had you received any previous calls of a nature regarding narcotics in that area prior to this?

OFFICER LOAIZA: Yes.

MR. GREEN:

> Q. And when was that?

OFFICER LOAIZA:

> From what I remember, it was, like, three or four previous assignments which we received of narcotics sales occurring at that location *with the same description*.

Exhibit A at 1011:11-21.

After Plaintiffs were able to discretely address the matter away from the jury, the Court indicated that Officer Loaiza had violated this Court's ruling. Exhibit A at 1052-1053:23-3.

This violation referenced the details for calls received on August 26, 2007, details which the Court had unequivocally barred. This inadmissible testimony gave the impression that Officer Loaiza was telling the truth about all of the descriptions for all of the assignments that he claimed he received. The statement presented glaringly false evidence that Plaintiffs could not rebut without opening the door to the totality of the OEMC evidence. The August 26, 2007 calls contained no description of anyone selling drugs out of a gold Dodge Intrepid.

## D.    OEMC Witness Laura Dunaj

OEMC and 911 call center witness, Laura Dunaj, was called to the stand by Defendants for the sole purpose of giving testimony about details of 911 calls that had been barred. Laura Dunaj was a Rule 30(b)(6) witness produced by Defendants during discovery to describe the methods for conducting searches for the OEMC related to 911 calls and dispatches. After brief introductory testimony about her profession, Defendants asked to approach the witness in order to present her with Defendants' Trial Exhibit 1, which consisted of the event queries for August

14

26, 2007. These event queries contained the following: (1) "man selling drugs in the alley, male black, 400 lbs, dark complexion, customers lined up in the alley." and (2) "several drug dealers in the alley selling drugs." *See* Exhibits B and C.

Before Defendants called Laura Dunaj, Plaintiffs had again asked for guidance regarding the scope of her testimony and the Court's rulings in an effort to prohibit exactly what ultimately occurred—despite the Court's rulings. After Defendants' had described the 911 calls during their opening statement and after Officer Loaiza had given barred testimony regarding the same, Plaintiffs were rightly concerned about what this witness would say. Given the Court's rulings barring witnesses from talking about the details of the documented 911 calls and dispatches, Plaintiffs could not imagine a legitimate purpose for calling this witness. Tellingly, Defendants refused to tell Plaintiffs why they were calling Ms. Dunaj at all, stating only that Plaintiffs' counsel could object when she was on the stand in front of the jury. Exhibit A at 1055:9-19. In response to Plaintiffs' concerns, Counsel for the Defendants assured the Court that they had admonished their witnesses and that no future violation was in the offing.

> MR. GREEN:
>
> Obviously, Your Honor, I did talk to our future witnesses here about it, and I believe it was -- any interpretation that a violation occurred with the prior witness was purely unintentional, and we made sure we've, you know, explained that to the witnesses. As for Mr. Nathan, same thing.

*Id.* at 1055:20-25.

Counsel for the Defendants continued,

> MS. SPILLANE:
>
> Your Honor, we certainly will not publish anything to the jury without Plaintiffs agreeing and having it all dealt with by the Court.

15

*Id.* at 1056: 3-5.

Instead, almost immediately after putting Ms. Dunaj on the stand and without consulting the Court or Plaintiffs' counsel, Defendants handed Ms. Dunaj the event queries for the August 26, 2007 911 calls:

> MR. NATHAN:
>
> Q. Are you familiar with Chicago Police Department event queries?
>
> MS. DUNAJ: Yes.
>
> MR. NATHAN:
>
> Q. And what are those?
>
> MS. DUNAJ:
>
> Event queries are information that comes into the 911 center. When a call comes in, an event is created and the information is put into this document and then sent off to be dispatched.
>
> MR. NATHAN: May I approach the witness, Your Honor?
>
> THE COURT: You may.
>
> MR. NATHAN:
>
> Q. I'm now showing you what has been marked as Defendants' Exhibit 1A.
>
> MR. C. SMITH: We would object, Judge, based on --
>
> BY MR. NATHAN:
>
> Q. I'm now showing you what's been marked as --
>
> THE COURT: All right. Just a moment, sir. May I take a look at it?
>
> MR. C. SMITH: Do you want to show her the other one, too?
>
> MR. NATHAN: In a moment, I was going to also refer to Exhibit 1B, and I intend to lay the foundation as a business record.
>
> THE COURT: Let's have a sidebar.

*Id.* at 1086:2-25.

During the sidebar, the Court made it clear that a discussion of the August 26, 2007 calls

16

was not a permissible purpose to call this witness. *Id.* at 1087:20-21. ("But you're trying to get in the same thing that I've already denied.")

After their impermissible use of the witness was denied, Defendants did not have a single additional question for Ms. Dunaj. *Id.* at 1088:9-11.

By this point, the damage had already been done. Defendants did not even need Ms. Dunaj to reach the details of the August 26, 2007 calls in order to serve their improper purposes. Defendants put on a 911 center witness for solely barred purposes, and based on Plaintiffs' objections, the witness was not allowed to answer questions. As with the Defendants' opening statement, Defendants made it clear to the jury that there had been 911 calls that Plaintiffs had prevented them from hearing about. Certainly the jury assumed from this that the calls were bad for Plaintiffs or were about Plaintiffs. Defendants' display also affirmed their unsupported claims made during opening statements and during Officer Loaiza's examination that they received multiple calls about a 500 pound man selling drugs out of a Dodge Intrepid. Defendants' use of Ms. Dunaj planted implications that could not be cured.

**E. Officer Rendon's Testimony Regarding Inadmissible Communications**

After Laura Dunaj left the witness stand, the Defense called Officer Rendon. Officer Rendon, an experienced police witness, felt free to blurt out testimony that had been clearly barred about the August 27, 2007 dispatch call *after* Byron Christmas' arrest.

The Court had repeatedly and explicitly barred this testimony. *See* Exhibit A at 803: 6-15, and Exhibit H, February 26 Ruling on Dispatch Call, *Christmas v. City of Chicago*, Judge Manning, Case No. 08-C-4675, Doc. No 104 (stating that only parties to Plaintiffs' malicious prosecution claim, of which Officer Rendon was longer a party to, could reference the dispatch if

17

a proper foundation could be laid). Defendants clearly understood this ruling. Defense counsel

stated at an earlier sidebar "We honor the Court's rulings … We can't talk about the call that

says, We've got the right guy." Exhibit A at 1001:10-12.

Regardless of the Court's rulings, during his direct examination, Defendant Rendon gave

the following testimony:

> MR. GREEN
>
> Q. Now, at sometime did you get a notification or receive some kind of
> notice that something had happened with that second surveillance?
>
> OFFICER RENDON: Yes.
>
> MR. GREEN:
>
> Q. And what was that?
>
> OFFICER RENDON:
>
> I was notified by radio, the people on the radio, that somebody had called
> up and told us that we had the right guy.
>
> MR. GREEN
>
> Q. And where did --
>
> MR. C. SMITH: Your Honor, could we have a sidebar?

Exhibit A at 1111:2-11.

Plaintiffs were again forced to object and make another motion for a mistrial. *Id.* at

1111:17-21. The Court denied the motion for a mistrial, and struck Officer Rendon's testimony.

*Id.* at 1112:15-16.

Again, however, the cat was out of the bag. Defendants had succeeded in doing what they

set out to do from the outset of trial, to poison the jury's perception of Mr. Christmas with barred

evidence and barred testimony. Officer Rendon said, in effect, that Mr. Christmas was guilty,

and that 911 evidence that the Plaintiffs were hiding backed him up. Cumulatively with the rest

of the evidentiary violations, this created a situation where Defendants repeatedly told the jury that Byron Christmas was a drug dealer who had been dealing drugs for many days at the same location out of Tiffany's gold Dodge Intrepid, and that after the arrest drug sales stopped.

### F.    Other Prejudicial Misconduct

In addition to directly and repeatedly violating this Court's orders, counsel for the Defendants engaged in other prejudicial conduct. Counsel repeatedly and distractingly inserted herself into the trial, directly addressing the jury and excusing herself for after choked up during a Defendant Officer's testimony. Exhibit A at 847:21. *See also Id.* at 311:20-21, 532:15, 835:13-16; 343:4-13.

In addition, counsel improperly questioned Tiffany Banks about how and where she came to learn about Plaintiffs' counsel. Exhibit A at 383-384:17-7. Plaintiffs objected and the objection was sustained. During her cross-examination of Tiffany Banks, the Court reprimanded counsel for her excessively argumentative examination. *Id.* at 356:3-15.

During closing, defense counsel repeatedly inserted herself into the case. For example, counsel said, "I am forced to do this job right now in the presence of a baby, and that again shows you what they will do." *Id.* at 1318:7-9. Plaintiffs objected and the objection was sustained. Counsel said that Plaintiffs' attorneys did not believe their own clients. *Id.* at 1319:13-20.[4] Plaintiffs objected and the objection was sustained. *Id.* Counsel also brazenly intimated that there was evidence that Plaintiffs had been brutalized as claimed in the past—just not by Defendant Officers. Plaintiffs objected and the objection was sustained. *Id.* at 1337-1338:23-10. This was tremendously prejudicial, and not a shred of evidence produced in discovery provided any support for this theory. Counsel then went on improper rant where she vouched for her

---

[4] As discussed below, this remark standing on its own constitutes grounds for granting a new trial.

19

clients:

> MS. SPILLANE:
>
>> On that intentional infliction of emotional distress, I will say this, and I'll take whatever hit I take in the rebuttal. The intentional infliction of emotional distress that occurred is against my officers and their families. Say whatever you want; I embrace it. Hit me, yell at me, do anything, but ultimately this is the time I finally get to speak as a complete and total advocate to say they did not do this, that they are absolutely innocent.
>
> THE COURT: Counsel, sidebar.
>
> MR. C. SMITH: We would object for the record.
>
> THE COURT:
>
>> You are getting totally personal. In closing arguments when you close, you're supposed to talk about the evidence that's been presented in this case.
>
> MS. SPILLANE:
>
>> I won't use "I" again. I'm sorry, Judge. You can say that and admonish me. I apologize. I shouldn't have said "I."

*Id.* at 1340:1-17.

Counsel also inaccurately misstated the burden of proof during her closing. The first time, counsel stated, "They sit there and say it's just preponderance of the evidence. How dare they say it's just preponderance of the evidence. You're talking about these five, the five of these men and a woman, their lives, and they say just a preponderance of the evidence?" *Id.* at 1346:7-11. The second time she said, "Are they perfect? No, but that's not the standard. They are not guilty." *Id.* at 1349:11-13. Plaintiffs objected after the second attempt to heighten the standard to the standard used in criminal cases. *See also* Exhibit A at 1339:18-25 ("They should use something like criminal sexual assault or criminal sexual battery, but they don't want to call it that because they're running from the case; we're not" rather than battery which is the appropriate

20

state law civil claim.); *Id.* at 567:6-8, 572-73:10-18, 573-74:22-4 (asking Officer Kubik if she

violated or attacked Ms. Banks in a sexual manner and referring to the allegations against Officer

Kubik as sexual abuse allegations, sodomy, rape, and alleged attempted rape.); *Id*. at 846:11-14

and at 847:5-6 (referring to the allegations against Officer Medina as allegations of crimes and

heinous crimes.); *Id.* at 1318-1319:25-4 (describing Plaitniffs' allegations as rape and sodomy);

*Id.* at 1345:22-23 (stating that Officer Kubik is being called a "virtual rapist."); and *Id.* at 1349:5-

6 ("these people have been accused of heinous crimes.")

Taken collectively with the violations described earlier in this motion, these statements

are not just slips of the tongue. Defense counsel repeatedly inserted herself into the case to

cultivate the impression that she was an aggrieved party who knew "truths" about the case which

she was not allowed to introduce to the jury, to cast aspersions on Plaintiffs' counsels'

credibility, and to heighten the burden of proof. This was communicated by shouting during the

sidebar, by the highly personal nature of her behavior, by trying to heighten the burden of proof,

and by the inappropriate statements made during closing arguments. The evidentiary misconduct

examined throughout this motion reinforced the role affected by counsel.

## III.    Defendants' Actions Prevented Plaintiffs from Receiving a Fair Trial

Many of Defendants' errors, violations, and prejudicial statements on their own are serious enough to merit the granting of a new trial. Taken together, weighing their cumulative impact, there is no doubt. Defendants' aggressive and sustained misconduct substantially prejudiced Plaintiffs and altered the outcome of this case. Defendants' actions denied Ms. Banks and Mr. Christmas a fair hearing of their serious civil rights grievances, a trial which should have been in keeping with this Court's evidentiary rulings. Further, Defendants' actions undermined the basic and historic safeguards that a trial by jury is intended to afford and were an affront to the jury system. Defendants' conduct, during opening, during sidebar, during testimony, and during closing, guaranteed that Plaintiffs would not receive a fair trial. The result was a clear denial of substantial justice. In these circumstances a new trial should be granted. *Garperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (internal quotation omitted). *See also Juneau Square Corp. v. First Wisc. Nat'l Bank*, 624 F.2d 798, 806 n.11 (7th Cir. 1980).

### A.  The Cumulative Impact of Defendants' Actions was Overwhelming

The Seventh Circuit has held that it is especially appropriate in 42 U.S.C. § 1983 cases to scrutinize an accumulation of errors that consistently favors the defendants. *Llaguno*, 763 F.2d 1560, 1570 (7th Cir. 1985). Writing for the Seventh Circuit, in remanding for a new trial, Judge Posner explained the problem with the accumulation of errors in a case like the present one,

> We need not decide whether any one of these errors would warrant reversal in and
> of itself, or even whether all together would warrant reversal in a different kind of
> case. But bearing in mind that civil rights actions often pit unsympathetic
> plaintiffs … against the guardians of the community's safety, yet serve an
> essential deterrent function especially at a time like this when the exclusionary
> rule is being narrowed we take a serious view of trial errors that consistently favor

22

the defendants in such a case.

*Id.*

   *Llaguno* was a civil rights case filed under 42 U.S.C. § 1983 for unreasonable search and seizure. The Plaintiffs were family members of an individual that was under investigation for multiple murders. In *Llaguno,* the defense brought in evidence and details of the murders that the defendants were investigating when they entered the Llaguno home. *Id.* at 1569. In *Llaguno*, the trial judge also instructed the jury that they were not to use 20/20 hindsight when evaluating the police defendants' behavior. *Id.* This statement is analogous to counsel's attempts to improperly raise the burden of proof. The Seventh Circuit held that gratuitous prejudicial statements, even ones that were not incorrect statements of the law, were part of the accumulation of errors and missteps that necessitated a new trial. *Llaguno* at 1570.[5]

   *Llaguno* parallels the present matter in several ways. The evidence of 911 calls, as improperly used by Defendants, was gratuitous and prejudicial just like the evidence elicited in *Llaguno*. The opportunity for undue and unfair prejudice far outweighed any relevance. *Id.* at 1569. As in *Llaguno*, these statements were used to remind the jury of Defendants' role as guardians of the public while shouting out that Byron Christmas is a drug dealer who cannot be trusted.

   In *Hillard,* also a § 1983 case, the Court used a similar rationale in granting a new trial based on the cumulative impact of trial errors. These errors included defendants' prejudicial references to plaintiff as an inmate, as a prisoner, and to the plaintiff's confinement in maximum security. 197 F.R.D. at 360-361. The Court found that the defendants' role in contrasting "the admittedly valuable role that the defendants play in keeping order in Cook County Jail" to their

---

[5] Defendants attempts to raise the burden of proof did veer sharply into incorrect statements of the law as described above.

description of the Plaintiff as an "inmate or prisoner" was especially troubling. *Id.* at 360. This

behavior, combined with misleading statements in the defendants' closing necessitated a new

trial. *Id.* at 361. In the present matter, Defendants also used every tool they could muster,

whether admissible or not, to disparage Mr. Christmas while playing up Defendants' law

enforcement credentials. Defendants impermissibly and repeatedly sought to portray Mr.

Christmas, age 41, as a hardened career drug dealer despite a complete absence of felony

convictions.

Defendants' errors were even more serious and more frequent than those responsible for

the new trials in *Llagano* and *Hillard.* The steady drumbeat of impermissible testimony,

described above, portrayed Mr. Christmas as responsible for crimes that did not occur on August

27, 2007 and that he was never charged with. Again, Defendants (1) forcefully introduced barred

911 calls during opening, (2) shouted that Mr. Christmas was a dangerous drug dealer who

threatened witnesses during sidebar, (3) raised barred 911 information during Officer Loaiza's

examination, (4) blurted out that the Officers received a call stating they got the right person

during Officer Rendon's testimony, (5) presented OEMC witness Laura Dunaj specifically to

introduce and discuss barred evidence, (6) behaved in a prejudicial manner throughout trial, and

(7) made grossly inappropriate arguments and statements during their closing. Defendants'

systematic behavior put Plaintiffs in the position of constantly objecting to testimony and

evidence that should never have been introduced in the first place.[6] This created the distinct

---

[6] In *Kiefel v. Las Vegas Hacienda* 404 F.2d 1163 (7th Cir. 1969), the Seventh Circuit upheld the
granting of a new trial and sanctions based on cumulative errors where counsel  among other things1)
made inflammatory statements during opening, 2) failed to file a deposition in the case, 3) made
assertions of fact not proved, 4) repeatedly made meritless objections, and 5) attempted to improperly
influence the jury by the introduction of statements into argument on matters not in evidence under the
pretext of laying a foundation for impeachment which were never offered. *Kiefel* at 1165. This list of

impression that Plaintiffs were hiding "evidence" of Mr. Christmas' alleged criminality from the jury. Like *Hillard* this may have impermissibly triggered "the jury's conscious fears or subconscious belief" that Mr. Christmas was a dangerous criminal. *Hillard* at 360.

Paired with the constant references to Defendants as guardians of the public safety, this must have caused the jury to tilt the scales in favor of the Officer Defendants. For example, *see* Exhibit A, at 525:1-4 (where Officer Kubik states that she works in a tough neighborhood because she wants to make things better for the people that live there); and at 530:13-15 (Officer Kubik states that she could chose to work a safer beat if she wanted to). While these examples are not particularly pernicious in isolation or warranting of reversal by themselves, the cumulative effect of these statements when paired with Defendants' other conduct cannot be ignored and could not be cured during trial. *Llaguno* at 1570.

**B. When Counsel Asserted that Plaintiffs' Counsel Did Not Believe Their Own Clients' Testimony, Counsel Committed Reversible Error**

During their closing argument defense counsel referred to Plaintiffs' counsel, stating "They didn't even have the guts with Officer Bocanegra to ask more than three or four questions yesterday. They didn't have the guts to talk to almost anyone that's here… They didn't even ask these officers: Did you or did you not do this? Why? They don't believe it themselves." Exhibit A at 1319:1-15. Plaintiffs objected and the objection was sustained. *Id.*

Almost identical comments warranted a new trial in *Spicer v. Rossetti,* 150 F.3d 642, 644-645 (7th Cir. 1998). In *Spicer,* a § 1983 case involving allegations of excessive force, defense counsel argued during closing that, "His own lawyer tells you we will never know. What

---

misconduct tracks Plaintiffs' objections to Defendants' conduct rather closely.

does that tell you about this case. It tells you his own lawyer doesn't believe his client... Ladies and gentlemen, he just stood up here and said we will never know how Mr. Spicer got injured. He's had conversations with his client and he's not even sure. He's not even convinced." *Id* at 643-44.

> The Seventh Circuit overturned the district court's denial of a new trial holding that:

> While we recognize that improper comments during closing argument rarely rise to the level of reversible error, we believe that defense counsel's comments here warrant reversal. Just as counsel may not express his beliefs regarding the honesty of the opposing party's witnesses, he may not express his belief regarding opposing counsel's opinions of honesty. These opinions have no place in a court of law, and defense counsel's conduct was grossly inappropriate. ... We cannot say that these comments might not have influenced the jury's verdict; indeed since the case turned entirely on Spicer's credibility, versus that of the guards, the improper comments were an egregious attack into the heart of the plaintiff's case. We therefore set aside the jury's verdict on the basis of misconduct by appellees' counsel during closing arguments.

*Id.* at 644 (internal citations omitted).

Like *Spicer,* which involved the word of an inmate versus that of prison guards, Plaintiffs' case turned on the same calculus of credibility. When it came down to it, liability turned almost exclusively on whether or not the jury found the Plaintiffs to be more credible than the Defendants. Counsel's inappropriate comments went to the heart of that determination. On its own, counsel's statement merits a new trial. That conclusion becomes inescapable after a review of counsels' other actions at trial that were designed to reduce Plaintiffs' and their counsels' credibility by giving the appearance that they were hiding information from the jury.

### C. Counsel's Other Prejudicial Statements During Closing Rendered the Trial Unfair to Plaintiffs

In counsel's closing argument, counsel proffered a theory of the case unsupported by any evidence at trial or evidence in the case. Counsel stated "Byron Christmas, unfortunately, probably has been, and Tiffany Banks and other people probably have been. Those very same things they said Officer Medina said, it probably did happen at some point in time." Exhibit A, at 1337-1338:23-10.

By intimating that there was evidence that Plaintiffs had been brutalized as claimed in the past—just not by Defendant Officers—counsel seriously prejudiced Plaintiffs. If jurors thought that there was evidence in this case, that they were not shown, indicating that Plaintiffs had claimed these sorts of injuries in the past, it would have been damning in its persuasive power. An improper, yet persuasive argument can constitute grounds for a new trial. *United States v. Van Eyl,* 468 F.3d 428, 436-38 (7th Cir. 2006). Similar in its prejudicial effect and persuasive power was counsel's attempt to inflate the burden of proof to something higher than the preponderance of the evidence. In her closing argument, counsel repeated an incorrect burden of proof three times. Exhibit A at 1346:7-11, 1349:11-13, and 1339:18-25. By telling the jury that the preponderance of the evidence was an affront to her clients, counsel explicitly told the jury to ignore the law. Was this argument effective? The result of counsel's improper attempts to turn this civil trial into a criminal proceeding speaks for itself. Counsel's argument was so intemperate, so personal, and so inflammatory, that the Court had to call a sidebar to admonish her. Exhibit A at 1340:1-17.

27

**CONCLUSION**

Many of the improper actions and violations documented in this motion would be sufficient grounds to grant the Plaintiffs a new trial on their own. However, the cumulative impact is clear. The actions of Defendants denied Plaintiffs a fair trial. Plaintiffs respectfully request that this Court grant a new trial on the grounds stated herein.

28